19-3672 from the Eastern District of Missouri, David Oetting v. David Sosne, et al. Very good. Welcome, counsel, to what we hope is our last week of virtual arguments. If we can get our courtrooms in St. Paul and St. Louis back up to speed, we appreciate your doing it this way with us to keep the litigation flowing for your clients and the court up to date. So Mr. Oetting, you are counsel for appellant. Please proceed. Good morning, Your Honor. May it please the court, I am David Oetting and I'm the court-appointed class representative for the nation's bank class. I've served in this capacity for over 20 years in this case. I haven't quit and I haven't been removed. In 2012, Appellees made a major decision to act against the interest of the class they represented. They gave away the settlement fund of about $10 million to a charity rather than the class members. Had they acted in the interest of the class, perhaps we wouldn't be here today. Instead, we have five law firms collecting almost $60 million in fees in 2004 and telling this court that they have the right to walk away from the case before its conclusion and keep all their fees because too much time has passed. The PSLRA rules of professional conduct and class action law never envisioned that class counsel, once paid their fees, not worry about finishing the case. Well, Mr. Oetting, that causes me to ask a question I was going to ask. Pages 33 and afterward on your brief, you accused three district judges of the Eastern District of Missouri, I believe all former chief judges, of breaching fiduciary duty to a class, Section 23 class. And I would like to know, sir, if you have got a citation of a federal appellate court that has ever held that a district court breached this asserted fiduciary duty. On page 33 of the primary brief? Well, that's the start up. Then the argument goes on. But it's mostly a continued assault on the class counsel. But you start out by saying three members of the district court breached their fiduciary duty to the class. You cite a couple of cases for the general proposition that the court has a duty of supervision. But I want to know if you have a case in which a federal appellate court has held that a district court breached a fiduciary duty to the class. Just yes or no. Well, I think there are several cases. If I read those cases, I'll find that the courts upheld or concluded there was a breach of duty. No, they held that there was a duty. Okay, I'm asking. There's a lot of dicta out there about duties and this and that. I want to know if a federal appellate court has ever held that a district court breached this asserted duty. I can't think of one offhand. Yeah, well, this is quite a serious accusation. And if you don't have a case supporting it, I question whether you should ever be approved as a class representative again. But carry on with your brief. Just to try and touch on where you are, there was a ruling by this court that there was a SIPRE provision put into the original settlement agreement back in 2002. I don't know if that wasn't the subject of a breach. But it certainly was an illegal provision that was engaged in by the five thousand. Come on, that's not an illegal provision. There are SIPRE provisions all the time. No, this one was held to be void ab initio. Well, is a simple mistake of law the breach of a fiduciary duty? I'm having a hard time believing that's the case. Well, the subsequent rollout from that provision was that the council gave the money away to a charity that they picked. Well, that's what happens when you apply the doctrine of SIPRE, right? Not for ten million dollars. The duty is to, by the council and by the court, to assure that the money that's supposed to go to the class goes to the class. But by applying the doctrine of SIPRE, you're claiming the judge made a mistake of law. And I don't see how making a mere mistake of law is a breach of a fiduciary duty. I mean, you know, I was a district judge for a long time. I made decisions every day that were less than perfect. I think this is a wild accusation to make against three judges. Well, I'm still not sure what you mean by the third judges. When it came to the SIPRE provision... Judge Nangle, Judge Jackson, and Judge Perry are all named in that section of your brief as having reached a duty to the class. Well, Judge Jackson issued an order to pay out the money to the charity, knowing full well that there was money that could be paid to the class, and having gotten an ex parte letter from a former judge on behalf of the charity, to pay the money to the charity. So there wasn't a holding on that, but the duty of Judge Jackson would have been to assure on behalf of the class that money was sent to the class, and it should have been. That has now been done, so far as we can go yet. But I think the duty is there, and the duty wasn't fulfilled. I'm not sure what Judge Perry is, except she ordered us to file this motion that's at issue. Your brief accuses her of neglecting the class since 2017. Well, again, to pay out the money that was sitting there, and it's been sitting there. We've been, since 2012 through this past March, we've been working to reverse that CyPray order. We've been successful, we've collected the money. There was some administrative things to do. There were some delays, but now we've paid out the cash portion of the CyPray distribution that we've collected back. And those checks are being cashed. But, with respect to Judge Perry, she ordered us to do something, and then we did it, and she said we were too late. But that's not quite exactly how it worked, wasn't it? She said if you want to file this motion, she gave you a deadline, but it's a bit of a mischaracterization, isn't it, to say she ordered you to file this motion? Well, you have to go back in time a little. The prior July, she threatened us with sanctions, contempt, if we did file it. And then this court lifted the stay on the bankruptcy case, time passed for appeal, and then she ordered us, I don't have that order in front of me, I don't mean to mischaracterize it, but now is the time to file whatever we were going to file, and we did. And then we had the Latches decision. So, Latches doesn't belong in the case. The PSLRA requires this look back of the reasonability of the fees, Rule 1.5C, as you wrote Judge Padden, the rules of professional conduct override the attorney's fees, and we're talking about disgorgement here. And what we have is, there has been a removal of the former lead counsel for cause, they had a conflict of interest. We've had abandonment by other counsel, and they're all claiming... There was an order of removal, and he went into bankruptcy, the firm went into bankruptcy. Both. Did the district court order the removal? Yes. For cause? Yes. What was the cause? The cause was conflict of interest. It was actually in three parts. Give me the date of these orders. July 15. They happened close on time in July 15, and... You mean July 2015? Yeah. One of them is at the appendix 112, and one of them is at the appendix 117. And so, the determination by the firm, Green-Jacobson, they closed their doors, it became public news. Went into a Missouri receivership that turned into a bankruptcy proceeding, and thereafter, as I say, appendix 112, document 842, dated 5-29-2015. There's a memorandum of order removing Green-Jacobson as lead counsel, and then a subsequent order on June 10th of 15, denying their motion... I'm sorry, I read the wrong one. Well, I'm not seeing the right appendix, but it was within the same month or so where they were first removed, and then they were denied application to take the position again as the lead counsel because of the conflict of interest, which is obvious. You can't represent the class when the trustee is debating the fees in one case, and you're not representing a claim in the bankruptcy of your same firm in the other case. The individual lawyers, Jacobson, Andrus, and Green, all had personal interests in the outcome of the bankruptcy case. So, I'll hold the rest of my time for later, if that's all right. All right, but you can't argue anything new on rebuttal. You can only respond to O'Felly's arguments on rebuttal. Yes, I understand, and there may be questions, I guess, too. I'll give a conclusion. Let me take a second to do that. We're not asking that the court should disgorge the entire fee. This case has been going on. Justice delayed, justice denied has already been identified. The trustee's delay has already been identified. There are retroactive rulings. There are compatible litigation that has caused delay, and what we would like this court to do is spear the brotherless ship into its birth and make a final order that has a forfeiture disgorgement because of all the bad acts that you've seen and ruled on. How much, if not the whole amount? Now, you've changed your position. No, we really haven't. You start with a full disgorgement, and then you add back a portion based on lodestar. Judge Perry did this in a similar way in one of her cases. So, you are asking for the $38 million, not something less. The total is $60,000, the lodestar is $20,000, and the difference is about $38,000, as you say. So, I'll wait for the rest of the response. Very good. For the affiliates, who was arguing? Joe Jacobson, Your Honor. Joe Jacobson. Okay, good. Can I start? Yes. Are you going to represent? You're taking the 15 minutes. I'm arguing for myself and the former class counsel for seven minutes. Mr. Entwistle will argue for a minute, and then Mr. Sosny's lawyer, Stephen Hiotis, will have seven minutes to argue on behalf of Bankruptcy Estate. All right, but if you take eight minutes, then somebody else gets less. We are not going to stretch the 15 with multi-lawyer confusion. Understood, Your Honor. Please proceed. Thank you, Your Honor. As mentioned, I'm Joe Jacobson. I'm representing myself and the former class counsel who are being asked to scourge the attorney's fees that were received in this class action back in 2004. The issue in this case is latches, because that was the ruling of Judge Perry. And the standard of review of latches, the standard of review is abuse of discretion. Abuse of discretion is both a standard for determining the amount, the reasonableness of the attorney's fees that were awarded, as well as whether a latches applies. And abuse of discretion occurs when the court has mislaid the relevant factors, included factors that shouldn't have been considered, didn't include factors, and so on. And as far as weighing the factors, made a clear error of judgment. That's what this court said in EEOC v. Product Fabricators in 2012, cited in our brief. Here, the facts on which the district court based its decision to apply latches are almost entirely undisputed. For example, among the undisputed facts are the dates on which Mr. Edding learned about the various acts and omissions he claims were misconduct in administrating a settlement fee fund, which he claims justifies the scourgement of the fees. Judge Perry lays those all out very well in her opinion. I don't see the need to go over it. I would refer the court, however, to one of the documents in this case, document 790, specifically at pages 11 through 12, which are in the appendix at 106 to 107, which was filed by Mr. Edding, it's a Mr. Edding's filing, in October of 2012. And that case, that is a filing in opposition to a motion that we had filed for an additional $98,114 in fees and expenses incurred in the years after the settlement had been approved, which was granted. In his opposition, Mr. Edding said, Green-Jacobson has done all these terrible things as class counsel, they shouldn't get the extra $98,000, and in fact they should disgorge $2,129,000 in previously awarded fees. Mr. Jacobson, let me ask you this. My impression, this is only my fourth time in this affair, is that this motion is the first time that disgorgement of the $38,000,000 has been sought. Have I missed something? Well, he did not file a motion for that previously, but in the papers at the place I'm pointing to, Your Honor, he says that while I'm only asking for $2,000,000 plus right now, they really should disgorge the entire $60,000,000 in fees that were awarded to class counsel. That's not a formal request. Correct. But it shows that there was a will... And when he represented a co-representative challenging the initial settlement, there was a request for disgorgement, but it wasn't the full amount. This reduce it to the lodestar was not a position taken, right? Your Honor, actually, his initial opposition to the settlement, his position was that he did not oppose the attorney's fee award. He said so in open court on the record in the fairness hearing. I'm talking about the lawsuit where he represented another objector. He represented Mr. Kaler, who was another objector. Right. Yes. In that proceeding, was the lodestar, reduce to lodestar position taken? No, it was not. It was... In the bankruptcy court, was that claim ever made? Before the ruling that it had to be done in this court, was there any claim for the $38,000,000? At that time, and Mr. Hiotis is going to be talking about that, his claim was for disgorgement of $10,500,000. Right. That's my point. This is the first time, 2017 or whenever, the first time in 15 years after the settlement, that the $38,000,000 was ever formally, so to speak, by motion put at issue. Is that right? Your Honor, that's correct. But I would note that he's at least on four separate occasions asked for disgorgements in the excess of millions of dollars. He's lost everything that's been litigated. That is correct. I'm talking latches. I'm talking about it takes 15 years to put a $38,000,000 at issue on the table. Correct, Your Honor. We think that's far too long. It's not just the $2,000,000 here and the $5,000,000 there and the $10,000,000 here, all of which have been raised in different contexts unsuccessfully. It's now suddenly Judge Nagle messed up, breached a duty 15 years ago of $38,000,000, right? Correct, Your Honor. I would note that he was thinking about that full amount, even though he didn't file a So I'm just pointing out that there was a huge delay and delay at a period of time when he knew he had his claim. He just didn't bother to follow the rules and file a motion. It's also undisputed that none of the other class counsel outside of my firm had any engaged in or had any responsibility for any of the claimed acts of misconduct that he's claiming. So all those people have nothing to do with Mr. Edding's claim. And Judge Perry, in fact, held that, quote, On its face, therefore, ordering the non-Green Jacobson law firms to disgorge their fees for the reasons asserted by Edding would be inequitable. And that's a document... Mr. Jacobson, in that respect, none of the other law firms, he never sought disgorgement of their fees at all. Am I right? Correct. Never. Never. And that was Docs 10-16 at 7. I see I have one minute left of my seven minutes. And I do want to make sure everybody else has. So the last thing is, in his brief, his reply brief, he raises for the first time the notion that the court doesn't have the power to apply latches. Obviously, it wasn't made in the district court, it wasn't made in his opening brief. It's waived. If it isn't waived, it runs directly into what Judge Loken said in the last opinion, which was that the district court should consider whether latches applies. And the cases he cited are wrong because those are all cases in which there is an actual statute of limitations that set a time. And the court held in each case that in those cases, because there was expressed statute of limitations imposed by Congress, it would violate the separation of powers for the court to now impose latches to shorten the time less than the statute of limitations. Here, there is no statute of limitations on when one can file a motion for disgorgement. Therefore, latches is appropriately there, as this court held in Judge Loken's opinion in the Edding v. Sosny case. I will now defer to Mr. Entwistle, who has a minute, and then Mr. Hiotis. I ask the court to affirm the decision below, and please put this case to rest. We've been doing this case for 18 years now, and I think it's time for everyone to move on to other legal business. May it please the court, my name is Andrew Entwistle of the Entwistle & Cappucci firm, and together with Armstrong Teasdale, we represent Appellee Entwistle & Cappucci. I'll be very brief. Let me begin by saying, Judge Kelly, you were absolutely correct. This is the very first time that Mr. Edding has made any suggestion that any non-green Jacobson firm, including Entwistle & Cappucci, should disgorge fees or was otherwise involved in any wrongdoing of any kind here. They were never mentioned prior to this point, as Judge Perry properly found below. Judge Loken and Judge Erickson's observations that nowhere in the record here is there any support for any of Mr. Edding's contentions against either Judge Nangle, Judge Jackson, or Judge Perry, or the non-green Jacobson firms, as Judge Perry found below, is precisely the point here. Judge Perry found directly that Entwistle & Cappucci and the other non-green Jacobson firms did not have any role whatsoever per the prior ruling of Judge Nangle, who specifically appointed and exclusively appointed the green Jacobson firm to oversee the administration with the claims administrator. Thus, there was absolutely no basis to suggest for the very first time, as Judge Loken pointed out and as you pointed out, Judge Kelly, some 15 years after the settlement was approved, that any non-green Jacobson firm, and particularly our firm, had any role whatsoever in the administration. Therefore, those claims had no factual basis. Latches has already been observed. This is the very first time that claim was raised, again, without any legal or factual basis. And we'd ask that Judge Perry's decision dismissing these claims be affirmed in all respects. I thank you all for your time this morning. Thank you, Counsel. Mr. Hiotis? Thank you, Judge Mayer. Please, the court. I'm Steve Hiotis. I represent David Sosny, the bankruptcy trustee. I will not repeat the arguments that have already been made by Mr. Jacobson and Mr. Entwistle that indicate Judge Perry expressly found that there was unreasonable delay and inexcusable delay in not filing the disgorgement request before Green Jacobson went into bankruptcy in May of 2015. I would like to focus on the prejudice to the bankruptcy estate. Mr. Edding, Green Jacobson was placed into an involuntary bankruptcy in March of 2015 and then relief was entered in a Chapter 7 case and David Sosny was appointed trustee. Mr. Edding filed a claim on May 20th, 2015 in the bankruptcy estate for a $10.5 million claim of which $1.89 million was for disgorgement. Not the whole $10.5 million. He had a $1.89 million claim for disgorgement. That claim is filed under penalty of perjury. He amended the claim three months later and he still left it at the same amounts, did not change the amounts. At that point, bankruptcy is a very statutory process. Claims are filed. Claims are approved or objected to. Mr. Edding's claim was objected to. But the trustee waited about a year and a half after the claims bar date. The claims bar date in this case was July of 2015. A year and a half later, the trustee moved for leave of court to make an interim distribution because he was holding more than $2 million of assets. And there were other creditors. Mr. Edding's client was not the only creditor in this estate. There were approved claims filed against the estate. There were more than $17 million of claims filed against this estate. The largest was about a $10 million judgment that was rendered against Green Jacobson. That was amended to about $7.9 million by the SKMDV claimant. So the trustee was sitting on this money. It's a very common procedure for a trustee to make interim distributions in the course of a bankruptcy. It's already been about two years. Creditors are out a lot of money. They're not going to get 100 cents on a dollar anyway. There's no interest earned on their claims. So the trustee asked Judge Renlund for leave of court to make an interim distribution. And at that time, he set a reserve because Mr. Edding's claim was on appeal to the 8th Circuit. And so he made a partial distribution on the SKMDV claim with the court's approval of about $8 million. And then he reserved about $1 million for Mr. Edding's claim. It was put off kind of at an escrow. And that was done about three times. And each time, partial payments were made on the approved SKMDV claim. And monies were set aside for Mr. Edding's claim if he prevailed on his appeal, which he did not. Judge Renlund entered that order on February 27, 2017. He found that the interim distribution was in the best interest of the estate. And he granted the application. As indicated in Mr. Sosny's trustee's affidavit filed in opposition to the motion for discouragement, to allow Mr. Edding to now make a $20 million or a $30 million claim against the bankruptcy estate would require the trustee, the trustee has then overpaid the creditors because they've already been paid partially on their claim based on a proportion of what their claim was versus what Mr. Edding's claim was. He had a $10 million total claim in the estate. And so if you play with the numbers, if Mr. Edding's claim was up to $20 million, we would probably have to try to go back to SKMDV and try to recoup about a million dollars of money that they would no longer be entitled to according to Mr. Edding because now he has a $20 million claim versus his original $10 million claim. And again, that was only a $1.8 million claim for discouragement. As indicated in the trustee's affidavit, that would cause a considerable amount of more delay and expense to the administration of the bankruptcy estate. Mr. Edding never amended his claim in bankruptcy estate to raise the discouragement claim above $1.8 million. And so at this point, we feel, and again, as Mr. Jacobson mentioned, the standard of review on this is whether the Judge Perry abused her discretion in denying Mr. Edding's claim, which has been pending for years and years. Everything that he has cited has been known to him since at least 2009, and he never made a claim for $38 million at any time against anyone. Counsel, let me ask you this about you say he never amended his claim. The claim bar, of course, is long gone. When he files this motion in the district court, was there something he should have filed in the bankruptcy court that he didn't, in your view? He could always file a claim, and he could always try to file an amended claim. Well, it would have been contingent. So, I mean, what should he have done when he filed the motion that the denial of which is on appeal is before us? He should have filed a claim for $38 million. But when? When? When? At the time of filing the case, if you have a claim, you should set forth. At the time of filing, he filed this motion or before that? No, at the time in the bankruptcy estate in May of 2015, he filed a claim and set forth $1.8 million of disgorgement. If he wanted $38 million, he should have set forth that in his claim. But you argued he never filed an amended claim. Now you're talking about the principal claim. I'm not a good enough bankruptcy lawyer to be able to follow your argument procedurally. Right. The fact is he filed a claim for $10 million under oath. That then sets the parameters of what you can do in the bankruptcy court. You don't have any other knowledge that he has a different claim. He's filed a claim for $10 million and everything was done based on that. You're answering the question I wasn't asking. So, that's all right. That's all right. So, there is some time for rebuttal, Mr. Edding. You're on mute, counsel. There we go. Sorry. The notion that we knew everything from 2009 on simply isn't true. The initial attack was against the Green-Jacobson law firm because under the rules of professional conduct and Judge Nagle's rule, the Green-Jacobson firm had signatory authority control over the trust funds. The people who worked directly under them were Heffler. And somewhere between the two of them, $6 million was paid out to Penta and his conspirators. So, that was where we started. That was the first effort. As time went by, we get up to 2015. We now have a Cypre distribution that appears to be done only by Green-Jacobson. None of the other firms objected to it and said, why don't you pay it to the class? In this ruling in 2015, we find out that the Cypre provision was void ab initio with confiscation and contrary to the interest of class. Again, none of the other firms stepped up. And when Green-Jacobson was actually removed, none of the other firms stepped up and we tried contacting a couple of them and there was just simply no response. So, we spread out and brought in our motion for a discouragement. Because it looked like... Can I interrupt here for a moment? Originally, you stated that we simply didn't know everything. And it took time for us to know everything. Do you have a case that says you need to know everything? Because I always understood that Latches, as an equitable doctrine, required you to act once you had a reasonable notice that something had happened. And at that point, you had an obligation of due diligence and investigation. We did. But the investigation was against the people who had the money, the class counsel. I'd like to point out one other thing that this is like in lucky brands. There is a continuing violation. We have another one today. Mr. Jacobson has announced that he was representing himself and former class counsel. And that puts him in a Rule 4-1.9 violation where he is representing class counsel against a former client having been removed by the court. I see my time is up. Thank you very much. Unless there are questions. Thank you, counsel.